UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80334-CV-SMITH
MAGISTRATE JUDGE REID

LOUIS BACCARI,

      Petitioner,

v.

MARK S. INCH,

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE RE
## FEDERAL HABEAS CORPUS PETITION - 28 U.S.C. § 2254

### I. Introduction

Petitioner, **Louis Baccari,** a state prisoner, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [ECF No. 1]. He attacks the constitutionality of his conviction for first degree murder with a firearm and robbery with a firearm in Palm Beach County Circuit Court, **Case No. 2009CF005155**. This case has been referred to the Undersigned pursuant to 28 U.S.C. § 636(b)(1)(B)-(C) and S.D. Fla. Admin. Order 2019-02. [ECF No. 2].

The Undersigned has reviewed the Petition [ECF No. 1], supporting Memorandum of Law [ECF No. 3], the state's Response [ECF No. 10], supporting appendices [ECF Nos. 11-12], and Petitioner's Reply [ECF No. 15]. Upon review, the Undersigned **RECOMMENDS** that the Petition be **DENIED**, as further discussed below.

### II. Claims

Construing the arguments liberally pursuant to *Haines v. Kerner,* 404 U.S. 519, 520-21

(1972) (per curiam), Petitioner raises five grounds for relief:

1.    Trial counsel failed to properly preserve a peremptory challenge during *voir dire*. [ECF No. 1 at 5; ECF No. 3 at 2].

2.    Trial counsel failed to: (a) conduct a DNA analysis of the victim's car; (b) call a critical witness; and, (c) determine if the Gas One videotape was improperly edited by the prosecution. [ECF No. 1 at 7; ECF No. 3 at 4].

3.    Trial counsel failed to advise Petitioner regarding the Felony Murder Rule and how it related to liability as a principal, thereby causing Petitioner to reject a fifteen-year plea offer. [ECF No. 1 at 8; ECF No. 3 at 7].

4.    Trial counsel was ineffective for waiving Petitioner's presence during discussions following the trial court's receipt of jury notes and when additional jury instructions were given. [ECF No. 1 at 10; ECF No. 3 at 9].

5.    Petitioner's right to a fair trial was violated when the trial court disallowed read-back of the defense's cross-examination of a state's witness, after allowing read-back of the direct examination. [ECF No. 3 at 13].

### III. Procedural Background

Petitioner was found guilty, following a jury trial, of the April 14, 2007 first degree murder with a firearm of John Blazevige, in violation of Fla. Stat. §§ 782.04(1)(a)1 and 2, 775.087(1), 775.087(2)(a)1, 775.087(2)(a)2, 775.087(2)(a)3, and 777.011 (Count 1), and robbery with a firearm, in violation of Fla. Stat. §§ 775.087(2)(a)1, 775.087(2)(a)2, 775.087(2)(a)3, §§ 812.13(1) and (2)(a), and § 777.011 (Count 2). [ECF No. 11-1, Exs. 1-4]. Petitioner was sentenced to two concurrent terms of life imprisonment. [ECF No. 11-1, Ex. 2].

Petitioner appealed, raising multiple claims, including **claim 5** of this Petition. [ECF No. 11-1, Ex. 5]. On **August 27, 2014,** the Fourth District Court of Appeal affirmed the conviction in a published, written opinion. *See Baccari v. State,* 145 So. 3d 958 (Fla. 4th DCA 2014),[1] [ECF

---

[1] In affirming Petitioner's conviction, the appellate court expressly relied upon Florida decisions that considered Fla. Stat. § 90.104(1) requiring a party to preserve its prior objection to a juror or jury panel by renewing the objection

No. 11, Ex.11]. Rehearing was denied on **September 19, 2014.** [ECF No. 11-1, Ex. 14].

On **August 12, 2015**, Petitioner returned to the state courts filing a counseled motion for post-conviction relief, pursuant to Fla. R. Crim. P. 3.850 ("Rule 3.850 Motion") raising multiple claims, including **claims 1 through 4** of his federal habeas petition. [ECF No. 11-1, Ex. 16]. Following the state's response, the trial court entered an Order denying in part Petitioner's Rule 3.850 motion and granted an evidentiary hearing solely as to Petitioner's claim that he was misadvised about a plea offer. [ECF No. 11-1, 11-2, Exs. 17-18]. Following an evidentiary hearing, the trial court entered an order reiterating its prior summary denial of some claims and denying on the merits the remaining evidentiary hearing claim regarding the misadvice of a plea offer. [ECF No. 11-4, Ex. 21].

Petitioner appealed challenging the denial of all of the claims. [ECF No. 11-5, Ex. 28]. The Fourth District Court of Appeal *per curiam* affirmed the denial of the Rule 3.850 motion in a decision without written opinion. *See Baccari v. State,* 263 So. 3d 784 (Fla. 4th DCA 2019), [ECF No. 11-5, Ex. 31]. After rehearing and rehearing *en banc* were denied, this proceeding concluded when the mandate issued on **March 8, 2019.** [ECF No. 11-5, Ex. 34].

Three days later, Petitioner filed his initial federal Petition for Writ of Habeas Corpus in this Court on **March 11, 2019**. [ECF No. 1]. In all, there appears to have been approximately **ten months** of un-tolled time during which no properly filed post-conviction motions were pending that would serve to stop the federal limitations. *See Pace v. DiGuglielmo,* 544 U.S. 408, 413 (2005); *see also Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1315-16 (11th Cir. 2006) (citing *Artuz v. Bennett,* 531 U.S. 4, 8, 11 (2000)).

---

before the jury is sworn. *See Baccari,* 145 So. 3d at 961 (citing *USAA Cas. Ins. Co. v. Allen,* 17 So.3d 1270, 1271 (Fla. 4th DCA 2009) (citing Fla. Stat. § 90.104(1); *Carratelli v. State,* 961 So. 2d 312, 318 (Fla. 2007)).

## IV. Threshold Issues - Timeliness and Exhaustion

### A. Timeliness

Respondent correctly concedes that this Petition was timely, because there was less than one-year of un-tolled time during which no post-conviction proceedings were pending after Petitioner's conviction became final when Petitioner filed his Petition. [ECF No. 10 at 9].

### B. Exhaustion

Next, Respondent concedes **claims 1 through 4** are exhausted, having been raised in the Rule 3.850 proceeding. [ECF No. 10 at 10]. However, Respondent argues that **claim 5** is unexhausted and procedurally defaulted from review because the claim was raised on direct appeal in terms of violation of state law and did not alert the state appellate court to the federal nature of the claim. [*Id.*]. Petitioner disagrees, arguing claim 5 was raised on appeal as one involving "federal constitutional error." [ECF No. 15 at 7-8].

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging a state conviction. *See* 28 U.S.C. § 2254(b), (c); *see also Davila v. Davis*, 582 U.S. ___, 137 S. Ct. 2058, 2064 (2017) (citing § 2254(b)(1)(A)). To properly exhaust state remedies, a petitioner must fairly present every issue raised in his or her federal petition to the state's highest court, either on direct appeal or on collateral review. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015) (citations omitted). To "fairly present" a claim requires Petitioner to alert "the state court that the claims asserted presents federal constitutional issues." *See Crayton v. Sec'y, Dep't of Corr.*, No. 17-15290-C, 2019 U.S. App. LEXIS 14424, 2019 WL 2374452, at *3 (11th Cir. May 15, 2019) (quoting *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007)). To do so, Petitioner must indicate "the

federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at *3 (quoting *Baldwin v. Reese,* 541 U.S. 27, 32 (2004)). Petitioner must also present his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Id.* (quoting *McNair v. Campbell,* 416 F.3d 1291, 1302 (11th Cir. 2005) (quotation marks omitted)).

Reviewing this claim, Petitioner raised **claim 5** on direct appeal but did so on the basis that the trial court abused its discretion in failing to give a full read-back of a witness's entire testimony, in violation of *Florida* law. [ECF No. 10 at 10]. Petitioner mentioned two federal, Ninth Circuit Court of Appeals cases, not for a proposition of federal constitutional law, but as a factual analogy to Petitioner's case. This is insufficient to alert the state courts to the federal constitutional nature of the claim. *See id.* Because the state court on direct appeal was not alerted to the federal nature of the claim, claim 5 is unexhausted.

### C. Procedural Default

Although claim 5 was not properly exhausted, that does not end the inquiry as this Court must next determine whether the claim is now procedurally defaulted from review.  The claim certainly is now procedurally defaulted because the deadline to properly present the claim as a federal claim has long passed.

To circumvent the procedural default, a petitioner must show cause and prejudice. *See Martinez v. Ryan,* 566 U.S. 1 (2012). The claim must also be "substantial." *Id.* at 17. To prove that a claim is "substantial," a petitioner must demonstrate that the claim has some merit. *Martinez,* 566 U.S. at 10.

Petitioner may also receive consideration on the merits if he can demonstrate that a

fundamental miscarriage of justice resulting in the continued incarceration of one who is actually innocent would otherwise result. *See McQuiggin v. Perkins,* 569 U.S. 383, 387 (2013); *see also Ward v. Hall,* 592 F.3d 1144, 1157 (11th Cir. 2010) (citations omitted). This exception requires Petitioner to demonstrate actual innocence, not just legal innocence. *See Rozzelle v. Sec'y, Fla. Dep't of Corr.,* 672 F.3d 1000, 1011 (11th Cir. 2012).

In any event, federal courts may "skip over the procedural bar issues" and judge the claim on its merits. *See, e.g.*, *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) (citations omitted); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust [state remedies.]"). Because Petitioner argues in his Reply that **claim 5** was raised as a federal constitutional claim, the merits of the claim is addressed in this Report, however, for reasons that will be explained, the claim does not warrant habeas corpus relief. *See Valle v. Sec'y, Fla. Dep't of Corr.*, 459 F.3d 1206, 1213 (11th Cir. 2006).

### V. Governing Legal Principles

### A. Standard of Review

"The purpose of AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016) (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)) (quotation marks omitted)).

The AEDPA provides that a federal court may not grant a habeas petition relief on any claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter,* 562 U.S. 86, 97-98 (2011); *Rimmer v. Sec'y, Fla. Dep't of Corr.,* 876 F.3d 1039, 1053 (11th Cir. 2017).

The AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state court decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 773 (2010) (quotation marks and citation omitted); *see also Lee v. Comm'r, Ala., Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013) (citations omitted). Thus, deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 182 (2011); *see also Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011).

For purposes of federal habeas review, "clearly established federal law" consists of the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000). To be entitled to relief, a petitioner must show that the state court ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Lee*, 726 F.3d at 1192 (quoting *Harrington,* 560 U.S. at 101-102).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts the governing law set forth by the United States Supreme Court, or arrives at a result that differs from Supreme Court precedent when faced with materially indistinguishable facts. *Id.* (quoting *Bell v. Cone,* 535 U.S. 685, 694 (2002)).

"A state court decision involves an 'unreasonable application' of clearly established federal law 'if the state court correctly identifies the governing legal principle' from the relevant Supreme Court decisions 'but unreasonably applies it to the facts of the particular case.'" *Id.* (quoting *Bell,* 535 U.S. at 694); *see also Williams,* 529 U.S. at 413. If, however, the state court decision is contrary to clearly established federal law, the federal habeas corpus court must independently consider the merits of Petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).

Notably, where "no state court has adjudicated the merits of a claim that was properly presented, 'federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo*.'" *Reaves v. Sec'y, Fla. Dep't of Corr.,* 872 F.3d 1137, 1151 (11th Cir. 2017) (alteration in original) (quoting *Cone v. Bell,* 556 U.S. 449, 472 (2009)). The Court is authorized to deny a claim for federal habeas corpus relief when the claim is subject to rejection under *de novo* review, regardless of whether AEDPA deference applies. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *see also Connor v. GDCP Warden,* 784 F.3d 752, 767, n. 16 (11th Cir. 2015).

Finally, it is well settled that Petitioner bears the burden of establishing his right to federal habeas corpus relief and proving all the facts necessary to demonstrate a constitutional violation. *See Romine v. Head,* 253 F.3d 1349, 1357 (11th Cir. 2001)).

**B. Ineffective Assistance of Counsel Principles**

**Claims 1 through 4** challenge counsel's effectiveness which are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Strickland,* 466 U.S. at 684–85. When assessing counsel's performance under

*Strickland,* the court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Petitioner must provide factual support for his contentions regarding counsel's performance. *See Smith v. White,* 815 F.2d 1401, 1406–07 (11th Cir. 1987).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and (2) he suffered prejudice resulting from that deficiency. *See Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See id.* at 690-91.

To establish deficient performance, Petitioner must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland, supra.; see also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). Counsel is not ineffective for failing to raise non-meritorious issues. *See Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *See Dell v. United States,* 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on either one. *See id.* at 697; *see also Brown v. United States,* 720 F.3d 1316, 1326 (11th Cir. 2013).

## VI. Facts Adduced at Trial

Given the claims raised in this proceeding, a summary of the evidence adduced at trial follows as it amply supports Petitioner's convictions.[2]

### A. State's Evidence

The conviction arose out of the shooting death of Blazevige, who died from a single gunshot wound to the upper abdomen. [ECF No. 12-1, Ex. A at 657].

A witness who lives on the same street in Delray Beach, Florida where Blazevige was shot to death on April 14, 2007, testified that on that day, in the late afternoon, he was going out to buy some take-out food, when he heard a "pop" that sounded like a gunshot, and then observed a man running towards a pick-up truck about 300 feet away. [ECF No. 12-1, Ex. A at T. 605-617]. The dark-colored pick-up drove away fast, and when the witness passed the location where the pick-up had been, he saw a body lying in the street, noticed the man had been shot, and called 9-1-1, waiting there until police arrived. [*Id.* at T. 618-20].

A second witness who also lives in the neighborhood, testified she heard loud "pops" and then observed a large, black truck driven by a man, quickly turn around in her driveway, speeding away fast. [*Id.* at T. 627-34]. The truck caused damage to her grass as it turned around. [*Id.*].

The manager for Townstar, a group of gas stations/convenience stores, testified that a gas sales receipt showing April 14, 2007 at 3:06 p.m., found in the victim's struck after the murder, came from a Townstar store in Okeechobee. [*Id.* at T. 728-34].

---

[2] References in this Report to the trial transcripts [ECF No. 12-1, Ex. A] and Rule 3.850 Motion hearing transcript [ECF No. 12-2, Ex. B], filed on CM/ECF, the court's electronic docket, are noted with the letters "T" and the page number of the transcript and not that imprinted by the Court's electronic docketing system.

The victim's mother, Judith Conway ("Conway"), testified Blazevige and Petitioner were friends, and that Petitioner had lived with Conway in the fall of 2006, but moved out after a week and a half, leaving three boxes of clothing at her home. [*Id.* at T. 769, 772-73]. After leaving Petitioner five or six messages on his cell phone, Conway threw out the boxes. [*Id.* at T. 778-79]. Blazevige, her son, who was addicted to pain medication, moved out of Conway's home after Christmas 2006, and moved to Okeechobee County to "come off drugs" and be with his girlfriend. [*Id.* at T. 784, 790-91].

Petitioner's co-defendant, Anthony Bussey ("Bussey"), testified pursuant to a cooperation agreement with the state, that in April 2007 he had known co-defendant Michael Marquardt for about three or four months, and was aware Marquardt owned a gun because Marquardt had previously shown it to him. [*Id.* at T. 825, 903-04]. Bussey also testified he knew Petitioner and identified him in court. [*Id.* at T. 827]. Bussey explained that on April 14, 2007, Marquardt had agreed to lend him some money. [*Id.* at T. 832-33, 917-20]. He did not ask anyone else at the time to lend him money. [*Id.* at 917-18].

On that day, Marquardt met Bussey at a Checker's restaurant, where he arrived in a dark blue or black pick-up truck accompanied by Petitioner, who was sitting in the passenger seat. [*Id.* at 833-37]. When Bussey asked for the money, Marquardt responded that he needed to "bust a lick right quick," meaning he needed to "make a sale of a controlled substance." [*Id.* at T. 838, 847, 997].

Bussey got into the truck and Marquardt drove to a One Stop gas station where they just sat there for a while. [*Id.* at T. 848-49]. Petitioner told Marquardt as they left the One Stop that, "that when we get there, I'm going to call your phone. I just want you to say that you're good, that

you're bringing it, you got it." [*Id.* at T. 852]. Bussey testified that they then drove to a nearby residential neighborhood, near a school, where he observed a parked blue truck on the east side of the road. [*Id.* at T. 853, 858-59]. Marquardt parked his truck about five feet from the blue pick-up. [*Id.* at T. 860].

Petitioner exited Marquardt's truck, went to the driver's side window of the parked blue pick-up, and engaged in a conversation with its occupant. [*Id.* at 854-55]. Bussey could not see what Petitioner was doing but did see Petitioner return to Marquardt's truck a few minutes later. [*Id.* at T. 857]. At first, Bussey did not believe a robbery was going to occur, and it was only after Marquardt received a cell phone call and he spoke with Petitioner that Bussey then realized a robbery was going to happen. [*Id.* at 931]. As Petitioner was returning to Marquardt's truck, Bussey saw the occupant of the blue truck exit his truck and say, "Man, give me my money or give me my pills." [*Id.* at T. 861, 1000-01]. Petitioner then turned towards the individual, and Bussey heard a loud gunshot. [*Id.* at T. 863]. At the time, the front windows of Marquardt's truck were lowered. [*Id.* at 863-64]. Bussey panicked immediately following the gunshot, but recalled Marquardt telling Petitioner to "get in the car" and Petitioner responding, "hit it, go, go, go." [*Id* at 864]. As Petitioner got back into the truck, Bussey observed Marquardt's gun in Petitioner's hand, and identified the gun as state's Exhibit 15 at trial. [*Id.*]. On that day, Bussey testified no one was wearing gloves. [*Id.*].

After the shooting, Marquardt fled the scene, driving to a residence, and pulled into the driveway, where a man was waiting outside, who told Marquardt, "Man, y'all get out." [*Id.* at T. 869]. Marquardt then told the man he was going to leave his truck there and asked the individual to drive him home. [*Id.* at T. 870]. Bussey, Marquardt, and Petitioner exited the truck and got into

a white Kia, taking the gun with them. [*Id.* at T. 868-70, 872-73]. Bussey did not learn the identity of the individual they met until after he was arrested. [*Id.* at T. 936]. The Kia was driven by Thomas Marquardt ("Thomas"), Marquardt's cousin. [*Id.* at T. 873-74, 936, 940, 1002-03].

Bussey testified that the gun remained on Petitioner's lap as they drove to a Target store at Gateway and Congress. [*Id.*]. Petitioner bought beer and they all returned to Thomas's house, where they then switched to Thomas's wife's SUV, drove to a Mobil gas station, at which time Petitioner handed Bussey $50. [*Id.* at T. 875-77]. Bussey did not see the gun in the SUV. [*Id.* at T. 878]. Bussey was later dropped off in Delray Beach. [*Id.*].

A few days later, Petitioner and Marquardt came to Bussey's home in Lake Worth. Marquardt handed Bussey the firearm and asked that he "touch it," because Bussey was acting "scared" and Marquardt did not want Bussey to "talk." [*Id.* at T. 879-81, 965]. Several days later, Marquardt picked up Bussey, driving them to Thomas' house. [*Id.* at T. 882-83]. Marquardt gave Thomas the holstered gun, and Thomas went into the house and hid it in the attic. [*Id.* at 884].

Bussey was arrested on April 28, 2007. [*Id.* at T. 889]. At first, Bussey told police he knew nothing about the April 14, 2007 shooting, and denied speaking with Marquardt that day, but then he told police "everything, from the beginning to the end." [*Id.* at T. 889-90, 949-50, 956]. He claimed that he first "played dumb" because he feared for his life. [*Id.* at T. 1021].

Although, he was initially charged with first degree murder and robbery, Bussey explained that he agreed to plead guilty to second degree murder, and to cooperate and testify truthfully, in exchange for a sentence of twenty-one years of imprisonment. [*Id.* at T. 890, 950, 1022]. If, however, he testified falsely, Bussey understood that the plea would be "dropped", and he would be taken to trial. [*Id.*].

13

Bussey admitted he knew that someone had died as a result of what he thought was a drug deal. [*Id.* at T. 891]. During cross-examination, Bussey admitted he had initially lied to police, telling them he had not touched the firearm because he was "scared." [*Id.* at T. 907-08]. Although he admitted his girlfriend was taking prescription medication for pain resulting from a car accident, Bussey denied selling prescription medicines. [*Id.* at T. 912]. He was extensively cross-examined regarding the lies he told during his initial statement to law enforcement, and comparisons were drawn between his prior statement and statements he made in connection with his guilty plea and his trial testimony. [*Id.* at T. 959-64].

During redirect examination, Bussey denied testifying on direct that "bust a lick" meant "a robbery." [*Id.* at T. 970]. Bussey did admit he got a "good deal," and accepted the deal because he "felt guilty about being there and not telling nobody." [*Id.* at T. 983-84]. Bussey opined he was in jail because Petitioner and Marquardt had identified him as the shooter. [*Id.* at T. 993]. Although Bussey maintained he "did nothing," he conceded he was going to serve his time for this homicide. [*Id.* at T. 1031]. He denied telling any fellow inmates that he had killed Blazevige. [*Id.* at T. 986, 1007-09].

Thomas Marquardt ("Thomas"), Marquardt's uncle or cousin, testified that Marquardt showed up at his house on April 14, 2007, driving a Chevrolet, king cab, four-door pick-up truck. [*Id.* at T. 1099-1104]. To open the back doors of a king cab truck, the front doors must first be opened. [*Id.* at T. 1103]. Thomas testified he gave Petitioner, Marquardt, and Bussey, who he met for the first time that day, a ride in his white Mazda. [*Id.* at T. 1004-08]. At that time, Thomas testified Marquardt told him they had "just shot somebody." [*Id.* at 1108]. After buying beer at a Target store, Thomas drove them to Marquardt's home, where he dropped all three of the men off.

[*Id.* at T. 1109-1112]. Once there, they jumped out of Thomas's car and got into a Honda Pilot owned by Marquardt's wife. [*Id.* at T. 1112]. Thomas admitted that he put the firearm in his attic. [*Id.* at T. 1127-28].

When police arrived to search his home on April 29, 2007, Thomas allowed them in. [*Id.* at T. 1129]. When police asked him about the homicide and the firearm they recovered from the attic, at first Thomas lied, telling them he knew nothing about it because he was "scared" of "going to jail." [*Id.* at T. 1130-31]. About a month later, after receiving a subpoena from the State Attorney's Office, Thomas went to Marquardt's home, and advised him of the subpoena and that he was going to "tell the truth." [*Id.* at T. 1131-33]. Petitioner was present during this discussion. [*Id.* at T. 1133]. Thomas testified that Petitioner responded by stating, "wouldn't it be funny if Tom got life and we got off." [*Id.* at T. 1133]. Thomas also testified Petitioner asked him to lie on his behalf and wanted Thomas to state that Petitioner had looked "roughed up" when he saw him back on April 14, 2007. [*Id.* at T. 1134, 1148-49]. Thomas, however, did not agree, one way or another, to do so. [*Id.*].

During cross-examination, Thomas testified that Bussey had stated the firearm felt good in his hand, claimed to have committed the shooting, and did not appear remorseful. [*Id.* at T. 1145-46]. Thomas further testified that the gun belonged to Marquardt because he had previously seen Marquardt with it. [*Id.* at T. 1147]. Thomas testified that he never saw Petitioner in possession of the firearm and claimed Bussey had it at the time the three individuals got into his white Mazda on April 14, 2007. [*Id.* at T. 1150].

Experts testified at trial that the shell casing found at the murder scene was fired from the pistol found in Thomas's garage attic. [*Id.* at T. 1170-1192]. DNA swabs were taken from various

portions of the pistol and holster, which were then compared to known standards for Petitioner, Bussey, and Marquardt. [*Id.* at T. 1350-88]. Bussey and Marquardt's DNA were found on the holster. [*Id.* at T. 1368-70, 1388, 1399]. DNA swab taken from the grip area of the firearm revealed three individuals. [*Id.* at T. 1372]. Bussey and Marquardt could not be excluded from the DNA found on the grip, hammer, trigger guard, and trigger. [*Id.* at T. 1372-74]. Petitioner and Bussey could not be excluded from the DNA found on the slide area. [*Id.* at T. 1377]. Although these individuals could not be excluded from the DNA profile, the expert testified she could not conclusively state it was, in fact, their DNA, except as to that found on the holster. [*Id.* at T. 1399].

Boynton Beach Police Officer Luis Rodrigues ("Ofcr. Rodrigues") testified that on July 10, 2005, approximately two years before the murder, he took a .45 caliber firearm and a .45 caliber casing from Michael Marquardt. [*Id.* at T. 753-55].

Two officers with the Palm Beach County Sheriff's Office testified regarding the evidence recovered from the crime scene, including a shell casing, gas receipt, and paperwork from a check cashing store found in the victim's truck. [*Id.* at T. 1434-1656]. Cell phone records between Petitioner and Marquardt, Petitioner and the victim, Marquardt and Thomas, and Petitioner and Bussey were introduced and played to the jury, with a cautionary instruction that the transcripts are not evidence of what the case was about. [*Id.*]. The officers further testified that Petitioner and Marquardt were interviewed, and portions of their statements were introduced and played for the jury. [*Id.*].

## B. Defense Case

In its case, the defense presented the testimony of Melvin Goodwin ("Goodwin") who was incarcerated at the Palm Beach County Jail for over a year and shared a cell in 2011 with Bussey.

[*Id.* at T. 1729-33]. Goodwin testified Bussey told him he was the one that "pulled the trigger." [*Id.* at T. 1735]. Goodwin admitted, however, that Petitioner had threatened to have someone "get to him" about a week before the trial but denied being threatened that morning. [*Id.* at T. 1739, 1761]. He also denied being offered anything in exchange for this testimony. [*Id.* at T. 1760].

## VII. Discussion

### A. Ineffective Assistance of Counsel Claims

1. Failure to Preserve Preemptory Challenge

In **claim 1,** Petitioner asserts that trial counsel failed to properly preserve a peremptory challenge during voir dire. [ECF No. 1 at 5; ECF No. 3 at 2]. Petitioner claims the court improperly denied defense counsel's use of a peremptory challenge against venireperson number 5-7 even though counsel had provided a race and gender-neutral reason for the challenge. [ECF No. 3 at 2]. Defense counsel failed to renew his objection to the court's ruling until after the jury was selected and sworn. [*Id.*]. The following day, counsel attempted to preserve the objection, and the trial court allowed it, finding it was "close enough to be timely." [*Id.*]. On direct appeal, however, the appellate court disagreed, finding the issue was not properly preserved. [*Id.* at 2-3].

Petitioner argues he was prejudiced by his counsel's error. Moreover, he contends that prejudice, under *Strickland*, is measured against whether the appellate proceedings, not the trial proceedings, would have been different had counsel properly preserved the issue. [*Id.* at 3]. Thus, Petitioner states he need not show prejudice relating to the trial, only prejudice on appeal. [*Id.*]. In that regard, he argues his claim would have succeeded on appeal, his conviction reversed and remanded for a new trial. [*Id.*].

On the other hand, Respondent argues Petitioner is not entitled to relief having failed to

satisfy *Strickland*'s prejudice prong because he cannot demonstrate that had the issue been properly preserved, the outcome of his appeal would have been different, resulting in reversal of his convictions. [ECF No. 10 at 28-34].

The Equal Protection Clause prohibits the striking of potential jurors "solely on account of their race." *Batson v. Kentucky,* 476 U.S. 79, 86 (1986). A prospective juror may not be stricken "for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1746 (2016) (quoting *Snyder v. Louisiana,* 552 U.S. 472, 478 (2008)).

During voir dire, Lee McCarroll ("McCarroll"), venire number 5-7, a retired eleventh-twelfth grade schoolteacher, stated she had previously served as a juror in a criminal case, but could evaluate the evidence, keep an open mind, and be fair. [*Id.* at T. 32-54, 113-14, 169-70, 398-99]. Both co-defendant Michael Marquardt and Petitioner used a peremptory challenge to strike McCarroll. [*Id.* at T. 519-22]. The gist of the defense's response focused on their suggestion that McCarroll could not be fair and impartial because she was a former schoolteacher, who may have been exposed to school violence and shootings in Palm Beach County, and had previously served on a prior criminal jury trial. [*Id.* at T. 520-21, 523, 530]. The prosecution countered that their response remained pretextual because they had agreed to seat another former schoolteacher and another venireperson who had previously served as a juror. [*Id.* at T. 527].

The court denied the peremptory challenges against McCarroll, agreeing with the prosecution that the defense's arguments were pretextual, not genuine, and not race or gender neutral, given that the defense had not stricken juror no. 2-1, a retired teacher, nor juror no. 1-4, who had prior jury service. [*Id.* at T. 527-28].

First, as noted by the Florida appellate court on direct appeal, counsel failed to timely renew

18

its objection prior to the jurors being given the oath. *See Baccari,* 145 So. 3d at 963; [ECF No. 11].

There is no question that defense counsel performed deficiently in failing to properly preserve the objection. Florida law clearly requires the objecting party to renew and reserve the objection before the jury is sworn. *Carratelli v. State*, 961 So.2d 312, 318 (Fla. 2007). Otherwise, it is presumed that counsel has abandoned the objection and is satisfied with the selected jury. *Id.*

The question remains, however, under *Strickland*, what must Petitioner demonstrate to establish prejudice? Under Florida law, "in the context of the denial of challenges for cause, such prejudice can be shown only where one who was actually biased against the defendant sat as a juror." *Carratelli v. State*, 961 So.2d at 324. The Florida Supreme Court explained that the defendant must demonstrate that the juror was "actually biased" to succeed on his habeas claim. *Id. Fennell v. Sec'y, Dep't of Corr*., 582 F. App'x 828 (11th Cir. 2014).

With respect to peremptory challenges, however, the Eleventh Circuit appears to have come to a somewhat different conclusion. In *Davis v. Sec'y, Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003), in the context of a trial court's denial of a peremptory challenge on Batson grounds, the Eleventh Circuit held that the appropriate prejudice inquiry for the unpreserved challenge on habeas review was "whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." The Court held that it must consider "how Davis would have fared on appeal had counsel preserved a *Batson* claim for review." *Id*. There, because Florida's Third District Court of Appeal upon review of the claim had held that Davis's *Batson* challenge was "well taken," but had rejected it because of counsel's failure to preserve, the Eleventh Circuit found that Davis had established prejudice. The Court found that there was a

19

reasonable probability that Davis's conviction would have been reversed and he would have received a new trial had the error been preserved.

In analyzing whether prejudice should be measured by the outcome of the appeal or the likelihood of a more favorable result at trial, *Davis* noted that in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), *Strickland*'s prejudice prong required the petitioner to show "that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id*. at 1315-16. Thus, the prejudice showing can focus on the appeal, even if is trial counsel whose conduct was deficient. *Id*.

Thus, in light of *Davis*, the Court must determine not whether the outcome of Petitioner's trial would have been different but for counsel's deficiency in failing to preserve the issue, but whether the outcome of Petitioner's appeal would have been different. *See id.*; *see also Purvis v. Crosby,* 451 F.3d 734, 739 (11th Cir. 2006) (finding *Davis* only applies to those situations were counsel failed to properly preserve the issue for appeal, despite the intent to do so).

Turning to the merits of the *Batson* claim, the United States Supreme Court has set forth a three-part test for evaluating whether use of a peremptory challenge is unconstitutional: (1) the party challenging the strike must establish "a prima facie case to support an inference of purposeful discrimination," by showing the juror is a member of a cognizable group; (2) if a prima facie case is established, the opposing party must then provide race or gender neutral reasons for the strike; and, (3) the trial court must then determine if the party challenging the strike has established purposeful discrimination. *See Taylor v. Culliver,* 638 F. App'x 809, 814 (11th Cir. 2015) (citing *Batson,* 476 U.S. at 96-98).

When the claim was raised in the Rule 3.850 proceeding, the trial court denied relief based

on the state's response. [ECF No. 11, Exs. 18, 21]. In response, the state conceded that counsel's failure to preserve the court's denial of the defense's use of a peremptory strike to remove venireperson 5-7 satisfied *Strickland*'s deficiency prong. [ECF No. 17 at 189]. Respondent argued, however, that the claim did not warrant relief because Petitioner could not satisfy *Strickland*'s prejudice prong. [*Id.*]. In analyzing prejudice, however, the Respondent focused incorrectly on whether the outcome of the trial and not the appeal would have been different. *See Davis,* 341 F.3d at 1316; *Purvis,* 451 F.3d at 739. The state court's denial of the claim was subsequently *per curiam* affirmed on appeal in a decision without written opinion. *See Baccari v. State,* 263 So. 3d 784 (Fla. 4th DCA 2019), [ECF No. 11, Ex. 31].

Because state court incorrectly applied the law, this Court must review the claim *de novo*. *See Panetti v. Quarterman*, 551 U.S. at 954. Here, under a *de novo* review, the trial court's ultimate decision that no *Strickland* prejudice had been established is correct, arguably for a different reason. Petitioner suggests that the defense's arguments for striking McCarroll was sufficient to establish gender and race neutral reasons. Petitioner maintains the trial court erred in accepting the prosecution's arguments that the reasons proffered by the defense was not genuine or pretextual. It is well established that a trial judge has the unique opportunity to observe the demeanor of the party who justifies the strike, as well as the demeanor of the particular prospective juror the party is seeking to strike as he or she interacts with counsel during voir dire. *See e.g., Hernandez v. New York,* 500 U.S. 352, 365 (1991) ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies '[P]eculiarly within a trial judge's province.'") (citations omitted)).

Thus, deference is afforded to the trial court to determine whether the challenging party's

explanation for dismissing a member of the venire is credible. *See Rice v. Collins,* 546 U.S. 333, 338-39 (2006). If the challenging party presents a "comprehensible reason" and his motive is not inherently discriminatory, his explanation need not be "persuasive, or even plausible" to suffice. *Id.* at 338. Further, negative experience with law enforcement, age, life experience, type of employment, demeanor, and inattentiveness have been found to be acceptable race-neutral bases for peremptory challenges. *See United States v. Thomas,* 315 F. App'x 828, 834 (11th Cir. 2009).

Given the record before this court, however, it cannot be said that the trial court's finding that the defense did not offer a race or gender-neutral reason was an unreasonable application of *Batson.* Neither in the state forum nor here has Petitioner established trial court error. The trial court's finding of fact was correct. Consequently, even if trial counsel had timely renewed its objection, Petitioner cannot demonstrate prejudice under *Strickland* to warrant relief. In other words, he cannot demonstrate the outcome of his appeal would have been different, resulting in a vacatur of his convictions and remand for a new trial.

Additionally, during *voir dire*, the court advised the venire panel that if they believed that they could not render an impartial opinion in the murder trial, they could be assigned to a different type of trial. [ECF No. 12-1, Ex. A at T. 34-36]. Courts presume that jurors follow the court's instructions, put aside any biases, apply the legal standards contained in the instructions, and based its decisions solely on the facts introduced at trial. *See Ingram v. Zant,* 26 F.3d 1047, 1053 (11th Cir. 1994); *see also United States v. Khoury,* 901 F.2d 948, 955 (11th Cir. 1990). Therefore, the rejection of the claim is entitled to deference in this habeas proceeding. *See* 28 U.S.C. § 2254(e)(1). Thus, Petitioner is not entitled to relief on this claim.

2. Failure to Investigate Case

In **claim 2,** Petitioner asserts that trial counsel failed to (1) conduct a DNA analysis of the victim's car; (2) call a critical witness, and (3) determine if a video of Petitioner at Gas One was improperly edited. [ECF No. 1 at 7; ECF No. 3 at 4]. Respondent argues Petitioner is not entitled to relief on any of the arguments presented arising from counsel's purported failure to investigate the case. [ECF No. 10 at 36-54]. When the identical claim was raised in the Rule 3.850 motion, it was denied by the trial court, based on the state's response, which argued that Petitioner had not demonstrated that an investigation, as alleged, "would have actually produced evidence that could have undermined the confidence in the outcome of his trial." [ECF No. 11, Exs. 17-18]. The denial of the claim was subsequently *per curiam* affirmed by the appellate court in a decision without written opinion. *See Baccari v. State,* 263 So. 3d 784 (Fla. 4th DCA 2019), [ECF No. 11, Ex. 31].

### a. Failure to Conduct DNA Analysis

In **claim 2(a),** Petitioner argues that counsel failed to have the victim's car tested for Petitioner's DNA. [ECF No. 3 at 4-5]. Petitioner claims that on the day of the murder he was not with Marquardt, as Bussey testified, but was in the car with the victim, Blazevige, and accompanied the victim to the murder scene. [*Id.* at 4-5]. Petitioner maintains he asked trial counsel to have the victim's car swabbed for DNA which would have established that Petitioner was with the victim and inside his vehicle on the day of the shooting. [*Id.* at 5].

In the Rule 3.850 proceeding, the trial court adopted the state's response to the motion, wherein it argued that Petitioner had not shown that the day of the murder was the "only occasion he traveled in the victim's truck," because Petitioner had conceded that he and the victim were friends. [Ex. 12-1, Ex. A at T. 2342-43].

23

Petitioner has not demonstrated in the state courts nor here that swabbing the victim's vehicle for Petitioner's DNA would have confirmed that he had arrived on the day of the murder with the victim, rather than with Marquardt. Even if Petitioner's DNA had been found inside the victim's truck, Conway testified her son and Petitioner stayed in her residence between Thanksgiving and Christmas 2006 and had been friends. [ECF No. 12-1, Ex. A at T. 765-73]. Thus, the prosecution could have rebutted Petitioner's theory regarding how the DNA evidence came to be inside the victim's vehicle. Moreover, calling attention to Petitioner's relationship with the Blazevige could have hurt the defense by corroborating the other evidence demonstrating Petitioner shot and killed him.

Moreover, the evidence would also conflict with statements Petitioner had made to the police. Petitioner first claimed that on the day of the shooting he met with the victim at a Walgreens parking lot to obtain his clothes that were allegedly in the victim's possession. [*Id.* at T. 1490-92]. The state, however, called the victim's mother, Conway, who testified she had repeatedly contacted Petitioner, leaving him phone and text messages to pick up the clothes left at her home, but he refused, so she left them outside her home, on the porch, for about two weeks, before she finally threw them away. [*Id.* at T. 772-79].

During his statement to police, Petitioner claimed the victim asked him during the meeting at Walgreens to obtain a few hundred dollars of heroin and Roxicodone. [*Id.* at T. 1493, 1502]. As a result, Petitioner made a phone call in an effort to obtain the drugs for the victim. [*Id.*]. Petitioner denied, however, being inside either a black Chevy pick-up truck or a green, Chevy extended cab. [*Id.* at T.1498-99]. Petitioner claimed to have taken a bus to the Walgreens on the day of the shooting. [*Id.* at T. 1504].

Petitioner claimed Bussey, whom he referred to as a "n*****," shot the victim. [*Id.* at T. 1503-04]. He further denied talking with or otherwise seeing Bussey after the shooting. [*Id.* at T. 1506-08]. Also, Petitioner denied ever touching the firearm used to shoot the victim. [*Id.*]. Yet, Bussey testified that Petitioner made him touch the gun a few days after the shooting and claimed Petitioner was the shooter. [*Id.* at T. 879-81].

Given the foregoing, Petitioner has not demonstrated that counsel's failure to have the victim's truck tested for Petitioner's DNA would have affected the outcome of the trial, resulting in an acquittal of the charges. To the contrary, it would have contradicted his statement to police, reinforced the prosecution's theory, and hurt, rather than aided the Petitioner's mere presence defense. Thus, the rejection of the claim in the state forum was not an unreasonable application of *Strickland.* The rejection of the claim in the Rule 3.850 proceeding is entitled to deference and should not be disturbed here.

### b. Failure to Call Defense Witness at Trial

In **claim 2(b),** Petitioner asserts that counsel failed to subpoena a critical defense witness, Michael Louson ("Louson"), who Petitioner states had direct contact with Bussey immediately following the shooting. [ECF No. 3 at 5-6]. Petitioner proffers Louson would have testified that Bussey attempted to sell him the murder weapon, explaining he had shot someone with it. [*Id.*]. Respondent argues Petitioner is not entitled to relief on this claim because he has not demonstrated prejudice under *Strickland*. [ECF No. 10 at 53].

When raised in the Rule 3.850 proceeding, the claim was rejected by the trial court based on the state's response, which argued that Petitioner was not entitled to relief, having failed to demonstrate prejudice under *Strickland*. [ECF Nos. 11, Exs. 17-18]. The denial of this claim was

subsequently *per curiam* affirmed on appeal in a decision without written opinion. *See Baccari v. State,* 263 So. 3d 784 (Fla. 4th DCA 2019), [ECF No. 11, Ex. 31].

Under Florida law, for a claim of ineffective assistance of counsel, based on the failure to investigate, interview or call a witness, to be facially sufficient, the allegations must include: (1) the identity of the prospective witness; (2) that the prospective witness would have been available to testify at trial; (3) the substance of the testimony; and, (4) an explanation as to how the omission of the testimony prejudiced the outcome of the trial. *See Nelson v. State,* 875 So. 2d 579, 583 (Fla. 2004). Failure to demonstrate all four prongs above is fatal to such a claim under Florida law.

Under federal law, whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy seldom second-guessed by the court. *See United States v. Costa,* 691 F.2d 1358, 1364 (11 Cir. 1982); *see also Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir. 1995). To show that counsel's conduct was unreasonable, defendant must demonstrate that no competent counsel would have taken the action that his counsel did take. *See Chandler,* 218 F.3d at 1315. Establishing prejudice requires "allegations of what a witness would have testified to." *Sullivan v. DeLoach,* 459 F.3d 1097, 1109 (11th Cir. 2006) (quoting *United States v. Guerra,* 628 F.2d 410, 413 (5th Cir.1980)). Speculation about what witnesses could have said is not enough to establish the prejudice-prong of *Strickland. See Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir. 2004).

To establish prejudice, Petitioner must also show that the uncalled witness would have been available to testify at the time of Petitioner's trial. *See Reed v. Sec'y, Fla. Dep't of Corr.,* 767 F.3d 1252, 1262 (11th Cir. 2014); *see also Nelson,* 875 So. 2d at 579. Petitioner has not provided a sworn statement either in the state forum or this proceeding confirming that Louson would have

been available to testify and would have testified as proffered by Petitioner. Petitioner's allegations appear speculative.

Assuming that Louson would have testified as proffered, Petitioner has not demonstrated that this would have affected the outcome of the trial. The trial evidence established that the murder weapon was recovered from Marquardt's uncle's attic just a few days after the murder, consistent with Bussey's testimony regarding the firearm. Notably, Sergio George, the victim's neighbor, testified he only saw one male standing outside the victim's vehicle at the time of the shooting, and that individual was either white or Hispanic. [ECF No. 12, Ex. A at T. 2085]. Bussey is black. It cannot be said that counsel's strategic decision was unreasonable under the facts of this case. *See Miranda v. United States,* 433 F. App'x 866, 869 (11th Cir. 2011).

Finally, the purported testimony would have been cumulative to other evidence introduced at trial, including Petitioner's own statement to police suggesting that Bussey was the shooter, as well as, the testimony of defense witness Goodwin, an inmate who testified that Bussey admitted to him that he had shot and killed someone. [ECF No. 12, Ex. A at T. 1788]. Thus, counsel is not ineffective for failing to present cumulative evidence. *See Darling v. Sec'y, Dep't of Corr.,* 619 F.3d 1279, 1284 (11th Cir. 2010); *see also Van Poyck v. Fla. Dep't of Corr.,* 290 F.3d 1318, 1324 n. 7 (11th Cir. 2002).

Given the evidence of guilt adduced at trial, Petitioner's proffered testimony does not alter the outcome of the proceedings. *See Fugate v. Head,* 261 F.3d 1206, 1239, n.54 (11th Cir. 2001). Petitioner has not demonstrated deficiency or prejudice under *Strickland* arising from counsel's failure to investigate and then call Louson as a defense witness at Petitioner's trial. Petitioner cannot maintain an ineffective assistance of counsel claim "simply by pointing to additional

27

evidence that could have been presented." *Van Poyck,* 290 F.3d at 1324.

Thus, the rejection of the claim in the state forum was not contrary to nor an unreasonable application of *Strickland* and should not be disturbed here. *See Williams, supra.*

### c. *Failure to Verify Altered State of Videotape*

In **claim 2(c),** Petitioner asserts counsel was ineffective for failing to verify that the Gas One videotape had been altered by the prosecution. [ECF No. 3 at 5]. He suggests that an unaltered videotape from the Gas One station would have demonstrated that he accompanied the victim to the crime scene. [*Id.*]. He claims the prosecution altered the video, leaving the jury with the incorrect impression that he had not accompanied the victim. [*Id.*].

Respondent argues that Petitioner is not entitled to relief on this claim. Even if the videotape had been altered as Petitioner claimed, he could not satisfy *Strickland's* prejudice prong arising from the admission of the videotape. [ECF No. 10 at 51]. At trial, counsel argued Petitioner had been with the victim on the day of the shooting, rather than with his co-defendants, as suggested by Bussey. [ECF No. 10 at 49-51]. During closing, counsel pointed to the Gas One video which showed the Petitioner inside of the station where he allegedly he met the victim. [ECF No. 12, Ex. A at T. 2055-56]. The evidence at trial further revealed that during his April 27, 2007 statement, Petitioner also stated he had met with the victim, his friend, in an effort to get his clothes returned, and reiterated that he had been inside the victim's car on the day of the shooting. [*Id.* at T. 1490-91, 1499].

When raised in the Rule 3.850 proceeding, the claim was rejected by the trial court based on the state's response, which argued that Petitioner was not entitled to relief, having failed to demonstrate prejudice under *Strickland* in that Petitioner had not shown that further investigation

regarding the videotape would have altered the guilt phase of Petitioner's trial. [ECF Nos. 11, Exs. 17-18]. Further, the state argued, Petitioner cannot "obtain a hearing" or otherwise be entitled to relief on a claim that "an investigation might possibly produce exculpatory evidence" because relief cannot be had on a claim based on "speculation or possibility." [ECF No. 11, Ex. 17 at 201]. The trial court's denial of this claim was subsequently *per curiam* affirmed on appeal without a written opinion. *Baccari v. State,* 263 So. 3d 784 (Fla. 4th DCA 2019), [ECF No. 11, Ex. 31].

Petitioner is not entitled to relief on this claim having failed to demonstrate deficiency or prejudice under *Strickland* arising from counsel's failure to have the videotape examined in order to determine whether it was altered by the prosecution. Even if, as suggested, it had been, and further assuming counsel's investigation had confirmed this, Petitioner cannot demonstrate that additional footage of the videotape would have resulted in an acquittal of all charges. As noted above, Petitioner's counsel emphasized that still pictures taken from the video established Petitioner was with the victim at the station that day, in an effort to discredit the prosecution's key witness, Bussey. At best, the additional footage would have been cumulative of evidence already before the jury. Thus, the rejection of the claim in the state courts is entitled to deference and should not be disturbed here. *See Williams, supra.*

3. Misadvice Regarding Felony Murder Rule During Plea Discussion

In **claim 3,** Petitioner asserts that his trial attorneys, Atty Strecker and Atty Fountain, failed to advise him regarding the applicability of the Felony Murder Rule. [ECF No. 1 at 8; ECF No. 3 at 7]. Petitioner maintains he was unaware that if the jury found Bussey, not Petitioner, was the actual shooter, Petitioner could still be found guilty of felony murder. [ECF No. 3 at 7]. Petitioner claims that had he been properly advised he would have accepted the prosecutor's fifteen-year plea

offer conveyed prior to trial. [*Id.*]. Petitioner argues the trial court improperly rejected the claim in the Rule 3.850 proceeding because the testimony provided by state witnesses was merely "smoke and mirrors" to "distract attention away from the issue." [*Id.* at 9]. Petitioner is not entitled to relief on this claim.

When this claim was raised in the Rule 3.850 proceeding, the state court held an evidentiary hearing testimony from Petitioner's first attorney, LeRonnie Mason, Esquire ("Atty Mason"), his trial attorneys, Atty Strecker and Atty Fountain, and Petitioner. [ECF No. 11, Ex. 21; ECF No. 12, Ex. B]. The court entered a lengthy, detailed order denying the claim, finding in relevant part, as follows:

> The Defendant was first represented by LeRonnie Mason, Esq. Mr. Mason testified at the evidentiary hearing. Mr. Mason fully explained both the felony murder rule and the concept of principals to the Defendant. He explained to the Defendant that he could be found guilty of felony murder under a principal theory even if he did not possession [sic] the firearm used in the murder.
>
> At the time of trial, the Defendant was represented by Andrew Strecker, Esq. and Charles Fountain, Esq. Both testified at the evidentiary hearing. Mr. Strecker engaged in most of the pretrial conferences with the Defendant. It was apparent to the Court that Mr. Strecker and Mr. Fountain were both attempting to assist the Defendant at the hearing. However, **Mr. Strecker admitted that he did in fact instruct the Defendant on the felony murder rule and on the law of principals.**
>
> In addition to the instruction given by his counsel, there was a discussion of the felony murder rule and the law of principals in open court. The Defendant was present for these discussions and failed to express any misunderstanding of the legal concepts which could lead to a finding of guilt for first degree murder.
>
> As it was clear at the hearing that the Defendant was properly instructed on the law by multiple attorneys, a secondary theme developed relating to his attorney's view of the strength of the State's case. This secondary theme was that the Defendant was told that because his co-Defendant had testified in deposition that a robbery was not planned that the State would not be able to prove felony murder. In other words, if the State cannot prove a robbery was planned, the Defendant could not a principal in a robbery and the robbery was lynch pin of the

felony murder charge.

Both Mr. Strecker and Mr. Fountain provided some support for this theory. They each testified that they told the Defendant that the State could not prove that a robbery was planned and that, therefore, the State could not prove felony murder. Even if the Court were to find this testimony credible, the Defendant still cannot establish grounds for relief. At best, this testimony establishes that the Defendant's attorneys thought they had a defensible case.

What the Defendant cannot avoid is that he was properly instructed on the law. Based on the instruction, he knew a conviction was possible. Moreover, Mr. Strecker testified that he strongly recommended that the Defendant accept the State's 15 year plea offer and that the Defendant rejected his advice. Knowing a felony murder conviction was possible, the Defendant choose to take his chance and proceed to trial over his attorney's advice.

**Based on the evidence presented, the Court concludes that the Defendant did not establish ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984). Moreover, the Defendant did not establish prejudice.** The Defendant testified that he would have accepted a 15 year plea offer if he had been properly instructed on the felony murder rule and the law of principals.

**The Court does not find this testimony to be credible.** Mr. Fountain testified that the Defendant would not accept any offer over 10 years in the case.

Based on the evidence presented, the Defendant did not carry his burden on Ground Three of the Petition. . . it is

\*      \*      \*

ORDERED AND ADJUDGED that Grounds One, Two and Four of Defendant Louis Baccari's Petition to Vacate Judgment and Sentence are **DENIED** without a hearing. Ground Three is **DENIED** after hearing.. . .

[ECF No. 11-5, Ex. 22 at 5-7]. The rejection of the claim was subsequently *per curiam* affirmed

on appeal in a decision without written opinion. *See Baccari v. State,* 263 So.3d 190 (Fla. 3rd DCA

2014). As discussed below, the trial court's factual findings are supported by the record and are

not contrary to nor an unreasonable application of federal constitutional principles.

### a. Applicable Legal Standard

Unquestionably, defense counsel has an affirmative duty, under the Sixth Amendment, to provide competent advice, and to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to an accused. *See Missouri v. Frye,* 566 U.S. 134, 140-141 (2012); *see also Lafler v. Cooper,* 566 U.S. 156, 162-63 (2012) (citations omitted). The *Strickland* framework applies to advice regarding whether to plead guilty or proceed to trial. *See Lafler,* 566 U.S. at 162-63 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985)).

To prove prejudice, a petitioner is required to demonstrate that the outcome of the plea process would have been different with competent advice. *See Lafler,* 566 U.S. at 162-63; *see also Frye,* 566 U.S. at 146. Thus a petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 163.

### b. Analysis

At the Rule 3.850 hearing, **Atty Mason** testified he was appointed in April 2009 to represent Petitioner. [ECF No. 12, Ex. B at T. 116-23]. He remained Petitioner's counsel through October or November 2010. [*Id.* at T. 123-24]. During his representation, he recalled taking over twenty depositions. [*Id.* at T. 125]. Atty Mason further testified he would have explained the elements of robbery to Petitioner and could not recall Petitioner ever indicating he did not understand. [*Id.* at T. 129-30]. He also testified that he would have carefully explained the law to

Petitioner. [*Id.* at T. 131-32]. Notably, Atty Mason testified, that during one meeting, Petitioner "confided in [him] that he was the one who actually pulled the trigger." [*Id.* at T. 133]. While Atty. Mason represented Petitioner, he recalled the prosecutor did not extend a plea offer. [*Id.* at T. 138-39].

**Atty Strecker** testified he was privately retained by Petitioner's family. [*Id.* at T. 6-7]. He assumed representation from Petitioner's former counsel Atty Mason. [*Id.* at T. 8]. Atty Strecker recalled there were extensive plea negotiations with more than one prosecutor. [*Id.*]. Atty Strecker testified they "absolutely discussed" with Petitioner both the Felony-Murder and Principal theories and how it applied to his case. [*Id.* at T. 9]. He further recalled discussions with Petitioner regarding trial strategy based on Bussey's prior deposition testimony. [*Id.* at T. 11-12]. Although Bussey's deposition could have supported a theory based on robbery as the predicate offense, Atty. Strecker acknowledged they did not focus on the armed robbery because the prosecution had a witness that would testify the murder was not as a result of a robbery. [*Id.* at T. 11-15]. Atty Strecker explained Petitioner was pursuing a mere presence defense, denying that he had any premeditation or intention to commit murder or robbery. [*It.* at T. 16].

Atty Strecker was unequivocal that he discussed the fifteen-year plea offer with Petitioner several times, advised him to accept the offer, but Petitioner rejected it on the record. [*Id.* at T. 26-30].

**Atty Fountain** also confirmed he and Atty Strecker were privately retained by Petitioner's family and replaced Atty Mason as Petitioner's counsel. [*Id.* at T. 105]. Atty Fountain recalled the fifteen-year plea offer was conveyed to Petitioner by Atty Strecker. [*Id.* at T. 105-06]. Atty Fountain also testified he discussed the Felony-Murder Rule and Principal Agency Rule with

Petitioner and explained that the defense at trial was that there was no planned robbery and that Bussey was the shooter. [*Id.* at T. 106]. Atty Fountain further testified that Petitioner had indicated he would only accept a plea that would result in a maximum term of ten years of imprisonment. [*Id.* at T. 111-14]. He further testified that Petitioner never indicated after trial that he would have accepted the prosecutor's fifteen-year plea offer had he known the prosecutor could prove robbery as the predicate for first degree murder. [*Id.* at T. 115].

**Petitioner** conceded he was initially represented by Atty Mason, but was unhappy with his representation, so he discharged counsel and hired Attys Fountain and Strecker. [*Id.* at 58-60]. Petitioner admitted that while Atty Fountain and Atty Strecker represented him, they discussed the state's discovery, Bussey's deposition, the Felony-Murder Rule, Principal Theory, and the state's plea offers. [*Id.* at T. 59-62]. However, Petitioner explained that Attys Strecker and Fountain informed him that felony murder did not apply because Bussey would be testifying that "there was no robbery," so he rejected the fifteen-year plea offer based on counsel's advice regarding their theory of defense to the charges. [*Id.* at T. 62-63].

During cross-examination, Petitioner admitted Atty Mason provided him with the state's discovery and conceded that Atty Mason explained the concept of the Felony-Murder Rule related to Robbery and Principal theories. [*Id.* at T. 78-81, 100]. Although Petitioner admitted he met with Attys Strecker and Fountain numerous times prior to trial, he testified that they both told him that the Felony-Murder Rule did not apply to him. [*Id.* at T. 82-83]. Petitioner also denied telling Atty Fountain that he would not accept any plea offer resulting in a sentence greater than ten years. [*Id.* at T. 84]. Petitioner further testified that the fifteen-year plea offer was never made or conveyed until the first day of trial and claims to have informed the court of that fact when he was questioned

about the offer. [*Id.* at T. 84-85]. However, Petitioner admitted he advised the trial court that he rejected the fifteen-year plea. [*Id.* at T. 85].

### c. Conclusion

Based on all the foregoing, Petitioner's allegations in the state courts and this habeas proceeding are clearly refuted by the record and devoid of merit. The trial court's findings following an evidentiary hearing, which was summarily affirmed on appeal, are entitled to deference. Petitioner's "after the fact" suggestion that he would have accepted the state's fifteen-year plea offer had he been advised he could be convicted under the Felony Murder Rule, even if he were not the shooter, is not only belied by the record, but purely speculative. *See Tejeda,* 941 F.2d at 1558-59.

Nothing in the record supports a finding that Petitioner was misadvised by counsel to reject the state's plea offer. Petitioner has not met his burden of proof, having failed to demonstrate that counsel's purported deficiencies resulted in prejudice under *Strickland.* Petitioner, who bears the burden of overcoming the presumption of correctness by clear and convincing evidence, has not done so here. *See* 28 U.S.C. § 2254(e).

The trial court, who was in the best position to judge credibility, found Petitioner's testimony incredible and credited the testimonies of Atty Mason, Atty Strecker, and Atty Fountain. The credibility findings are supported by the record and entitled to deference here. *See Gissendaner,* 735 F.3d at 1323 (quoting *Harrington,* 562 U.S. at 105). The findings by the trial court were not an unreasonable application of *Strickland. See Premo v Moore,* 562 U.S. 115, 120-21 (2011) (quoting § 2254(d)). Therefore, relief is not warranted on this claim, and the rejection of the claim in the state forum should not be disturbed. *See Williams, supra.*

4. Waiver of Appearance

In **claim 4,** Petitioner asserts that trial counsel was ineffective for waiving his presence during discussions regarding the court's receipt of jury notes and when additional jury instructions were given. [ECF No. 1 at 10; ECF No. 3 at 9]. Petitioner claims counsel "waived his presence" without his consent. [ECF No. 3 at 9-12]. He also maintains that prejudice under *Strickland* is evident because Florida law requires strict compliance with Fla. R. Crim. P. 3.410. [*Id.*]. Thus, he concludes the trial court's denial of the claim in the Rule 3.850 proceeding was an unreasonable application of *Strickland.* [*Id.*]. Respondent argues that Petitioner is not entitled to relief on the claim, having failed to establish *Strickland* prejudice, because his due process rights were not violated. [ECF No. 10 at 78-86].

When the identical claim was raised in the Rule 3.850 proceeding, it was denied by the trial court, based on the state's response that counsel had waived Petitioner's presence. [ECF No. 11, Ex. 17 at 206]. Further, the state argued that defense counsel was present during the discussions and made arguments to the court in response to the jury's questions. [*Id.*]. The state also argued the court re-read parts of the standard jury instructions for robbery and the standard of proof. [*Id.* at 212]. Finally, the state argued Petitioner was not entitled to relief because he had failed to demonstrate that his absence from the courtroom during these discussions and instructions affected the results of his trial. [*Id.*]. The trial court's denial, based on the state's response, was subsequently *per curiam* affirmed on appeal in a decision without written opinion. *See Baccari v. State,* 263 So.3d 784 (Fla. 4th DCA 2019), [ECF No. 11, Ex. 31]. As discussed below, the trial court's conclusion was not contrary to applicable federal constitutional principles.

It is well established that a defendant's constitutional right to be present at all stages of his

criminal trial stems from the Sixth Amendment's Confrontation Clause, and some aspects of the right are protected by the Due Process Clause. *See United States v. Boyd,* 131 F.3d 951, 953 (11th Cir. 1997) (citing *United States v. Gagnon*, 470 U.S. 522, 526 (1985); *Kentucky v. Stincer,* 482 U.S. 730, 745 (1987)). Due process requires defendant's presence "at any stage of the criminal proceedings that is critical to the outcome if his presence would contribute to the fairness of the procedure." *Stincer,* 482 U.S. at 745. Petitioner's waiver does not have to be express or on the record for it to be valid. *United States v. Godwin,* 765 F.3d 1306, 1317 (11th Cir. 2014) (citing *Taylor v. United States,* 414 U.S. 17, 20 (1973)).

Review of the record reveals that during jury deliberations, the jury sent a note with several questions to the court asking, "One, can we get a copy of transcript without going into courtroom?" [ECF No. 12, Ex. A at T. 2114]. The court, the prosecutor, Marquardt's and Petitioner's attorneys all agreed to advise the jury that no transcripts of the court proceedings had been prepared, but if they wanted to hear some of the testimony, a recording would be played back for them. [*Id.* at T. 2114-16].

The second note posited by the jury stated: "Two, if we want to review the video interrogation, does the rest of the people have to come back to courtroom? Is there a copy that we can give them? A computer and laptop and just let them watch the DVD privately in the jury room themselves?" [*Id.* at T. 2116]. The prosecutor argued that the DVD was evidence and could be sent to the jury room for viewing. [*Id.* at T. 2118-32]. Petitioner's counsel objected, arguing any playback should be held in the courtroom. [*Id.* at T. 2127]. The objection was joined by Marquardt's counsel. [*Id.* at T. 2127]. The court sustained the objections and indicated it would instruct the jury that the video could be re-played in the courtroom. [*Id.* at T. 2128-29].

37

Shortly thereafter, the jury was brought into the courtroom, where the court informed them that a recording could be replayed in the courtroom for them. [*Id.* at T. 2142-44]. Regarding the videotape of the interrogations, the court also instructed the jury that they could view the DVD's in the courtroom, but it too would not go back with them to the deliberation room. [*Id.* at T. 2145-46].

Later, the jury sent an additional question: "If a robbery occurs while attempting to commit a sale or purchase of a controlled substance, does it matter if the robbery occurs before or after the death in order for it to be first degree murder?" [*Id.* at T. 2147-48]. After discussions between the attorneys and the court on how to respond to the jury's note, the court re-read part of the standard jury instructions for robbery and reasonable doubt. [*Id.* at T. 2157-68, 2169-72].

Another jury note was given to the court, asking "If a robbery occurred but was not premeditated or planned before, is that first degree murder?" [*Id.* at T. 2176]. A second question, which was scratched out, asked, "Please define conscious intent." [*Id.* at T. 2176]. After Petitioner's counsel waived Petitioner's presence, discussions ensued regarding conscious intent, principal theory, independent act, and how the court should respond and instruct the jury. [*Id.* at T. 2176-91]. After further discussions were had between the attorneys and the court, the jury was instructed without objection. [*Id.* at 2194-99, 2200-02].

At that point, however, the state indicated that it believed the defendants should be present in court when the jury was brought back, to which Marquardt's attorney responded that, in deference to the court and the deputy, so that the defendants would not need to be "shuffled" "in and out," they had not requested their presence. [*Id.* at T.2203-04]. The court responded that, if the defense or anyone wanted the defendants to present in court, he would do so. [*Id.*]. When asked

by Marquardt's attorney whether the court's ruling would have been different had Marquardt been present, the court stated "No." [*Id.*].

Given the foregoing, Petitioner has not met his burden here of establishing *Strickland* deficiency or prejudice. He has not shown how his absence during discussions regarding the jury notes and subsequent re-reading of the jury instructions, viewing of interrogations, and replaying of portions of testimony deprived him of any constitutional right. *See Snyder v. Massachusetts,* 291 U.S. 97, 108 (1934). Petitioner has also not shown that counsel was ineffective for waiving his right to be present during these discussions. Thus, the rejection of the claim in the state court is proper and should not be disturbed here. *See Williams, supra.*

### B. Violation of His Constitutional Right to a Fair Trial

In **claim 5,** Petitioner claims his constitutional right to a fair trial was violated when the trial court refused to allow a complete read-back of Petitioner's cross-examination of a state's witness. [ECF No. 3 at 13]. According to Petitioner, the entire cross-examination of Bussey should have been read, not just "ten lines out of 22 pages of cross examination." [*Id.* at 13-14]. Petitioner states that during direct, Bussey minimized his role in the murder, claiming Petitioner was the "triggerman," and "that Petitioner and Marquardt intended to rob the victim." [*Id.* at 14]. During cross-examination, Petitioner maintains that Bussey was "substantially impeached" regarding many of the "lies" he told police and his denial regarding his knowledge of and involvement in the murder. [*Id.*].

When the claim was raised on direct appeal, it was not raised in terms of a violation of Petitioner's "constitutional right to a fair trial." Instead, Petitioner argued that "the trial court abused its discretion by giving a limited read-back of testimony of key prosecution witness while

denying appellant's request for full read-back of witness' entire testimony." [ECF No. 11, Ex. 8 at 66]. As discussed previously in this Report, this claim is unexhausted and procedurally defaulted from review.

The claim was not raised in the state court in terms of a violation of federal constitutional principles, nor did he label or otherwise make the appellate court aware it was being argued in terms of a violation of his federal constitutional rights. To the contrary, it was argued in terms of trial court error and abuse of discretion. [ECF No. 11, Ex. 8 at 66-70].

The Eleventh Circuit has repeatedly held that federal habeas corpus review is not available for issues arising from violations of state law. *See Trice v. Sec'y, Fla. Dep't of Corr.,* 766 F. App'x 840, 848 (11th Cir. 2019) (citing *Jamerson v. Sec'y for Dep't of Corr.,* 410 F.3d 682, 688 (11th Cir. 2005)). Federal courts are bound by state court determinations on state law questions as they are "the ultimate expositors of state law." *Id.* (citing *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur,* 421 U.S. 684, 691, (1975)). The state law issue is not cognizable here even when "couched in terms of equal protection and due process." *Brannan v. Booth,* 861 F.2d 1507, 1508 (11th Cir. 1988) (citing *Willeford v. Estelle,* 538 F.2d 1194, 1198 (5th Cir. 1976)).

On appeal, Petitioner argued that the trial court abused its discretion in refusing to read-back the entire Bussey cross-examination. [ECF No. 11, Ex. 8]. Respondent, relying on *Mullins v. State,* 78 So. 3d 704 (Fla. 4th DCA 2012), argued that the trial court had "broad discretion in matters concerning the read-back or play-back of testimony. [ECF No. 11, Ex. 9 at 116]. Respondent argued that the jury's request was "specific," asking only for Bussey's "direct examination." [*Id.* at 117]. Because the portions of the testimony read to the jury were directly related and in response to the jury's request, Respondent argued it did not mislead or otherwise

place "undue influence on any particular statements." [*Id.*]. Thus, Respondent concluded that "the trial court did not err in providing the read-back as requested by the jury below including a portion of the cross examination." [*Id.* at 118]. Petitioner disagrees. [ECF No. 15 at 8].

Careful review of the record confirms that the jury note stated, "Read Bussey testimony. Direct, State only." [ECF No. 12, Ex. A at T. 2240]. Petitioner's counsel objected, requesting that the entire cross-examination be read as well. [*Id.*]. The prosecutor responded, arguing that "partial read backs are appropriate as long as . . . they're in direct response to what the jury is asking for." [*Id.* at T. 2243-44]. Petitioner's counsel, relying on *Mullins,* replied that failure to read-back the entire cross-examination "would unfairly highlight the State's version of the events, particularly about the 'busting a lick' comment." [*Id.* at T. 2257-59].

The trial court over-ruled the objection, finding *Mullins* distinguishable, explaining that Petitioner's argument would render the Florida Supreme Court's decision in *Garcia v. State,* 644 So. 2d 54 (Fla. 1994) "completely meaningless." [*Id.* at T. 2265]. The court, however, allowed a read-back of a portion of Bussey's cross-examination regarding the "bust a lick" comment. [*Id.* at T. 2266, 2311-12]. After it was read to the jury, the court advised the jury that if it wanted more portions of Bussey's testimony, or testimony of other witnesses read-back, in whole or in part, it would be provided. [*Id.* at T. 2316].

Respondent argues here, in accordance with the trial court's findings, that *Mullins* is distinguishable because the failure to include cross-examination in the *Mullins* case was error as it was within the scope of the jury's request, and the jury was not told that the play-back included only the direct examination testimony. [ECF No. 10 at 90-91]. The Respondent also argues correctly that, unlike the issue in *Mullins,* the jury here specifically asked only to have the direct

examination read-back. Therefore, the court did not err in limiting the read-back of Bussey's cross-examination.

On this record, Petitioner has not demonstrated he is entitled to relief, either based on a violation of state law, much less when couched, as here, in terms of violation of federal constitutional principles. Therefore, he is not entitled to relief on this claim as it is unexhausted, procedurally defaulted, not cognizable, and meritless.

### VII. Cautionary Instruction Re *Clisby*[3] Rule

Finally, this Undersigned has considered all of Petitioner's arguments in support of his claims for relief. *See Dupree v. Warden,* 715 F.3d 1295, 1299 (11th Cir. 2013). Petitioner has failed to demonstrate how the state courts' denial of the claims, to the extent they were considered on the merits in the state forum, were contrary to, or the product of an unreasonable application of, clearly established federal law.

The Court is mindful of the *Clisby* rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. To the extent a claim was not considered in the state forum, under *de novo* review, the claims do not warrant relief. Whether a precise argument was not specifically addressed herein or in the state forum, all arguments were considered and found to be devoid of merit, even if not discussed in detail.

### VIII. Evidentiary Hearing

Petitioner has not met the statutory threshold for granting an evidentiary hearing. In a habeas corpus proceeding, the burden is on Petitioner to establish the need for a federal evidentiary

---

[3] *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992).

hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). In reviewing a state habeas corpus petition in which Petitioner failed to develop the factual basis for a claim in the state court proceedings, the district court "shall not hold an evidentiary hearing on the claim unless the applicant shows that --(A) the claim relies on--. . .(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offenses." 28 U.S.C. § 2254(e)(2). The Supreme Court has also made clear that, § 2254(e)(2) "continues to have force" and restricts federal courts from considering new evidence where a claim was not adjudicated on the merits. *Cullen,* 563 U.S. at 185 (citing *Williams,* 529 U.S. at 427-29).

For the reasons stated in this Report, Petitioner is not entitled to an evidentiary hearing. *See Clark v. Att'y Gen'l, Fla.,* 821 F.3d 1270, 1291 (11th Cir. 2016) (citing 28 U.S.C. § 2254(e)(2)).

## IX. Certificate of Appealability

A prisoner seeking to appeal a district courts final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell,* 556 U.S. 180, 183 (2009) *(*citing *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000); *Wilkinson v. Dotson*, 544 U.S. 74, 78-83 (2005)).

This Court should issue a COA only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because Petitioner has not made that showing, no certificate of appealability should issue. If Petitioner does not agree, he may bring this argument

to the attention of the District Judge in objections.

## X. Recommendations

Based upon the above, it is RECOMMENDED that:

1.      the Petition [ECF No. 1] be **DENIED**;

2.      final judgment be entered in favor of Respondent;

3.      a certificate of appealability be **DENIED**; and,

4.      the case **CLOSED**.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

SIGNED this 20th day of October, 2021.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:     Louis Baccari, *Pro Se*
        DC#615791
        Calhoun Correctional Institution
        Inmate Mail/Parcels
        19562 SE Institution Drive
        Blountstown, FL 32424